# DECISIONS COURT OF APPEAL.

## Parish of Orleans.

5328.

(Court of Appeal, Parish of Orleans.)

### MRS. J. H. DRAPER vs. JOSEPH OPPENHEIMER.

1. Where property has been wrongfully converted, the owner may sue either for the property, or for its value, or in the alternative for the one or the other.
2. Any refusal to deliver the property, not founded on the existence of some right or interest therein, is a wrongful conversion thereof, sufficient to warrant an action for the value thereof and damages.
3. Upon all issues of fact the finding of the trial Judge is undoubtedly entitled to very great weight, but since the law grants an appeal on the facts as well as the law, an appellate Court is in duty bound to consider and weigh the evidence for itself and reach its own conclusion based thereon.

Appeal from the Civil District Court, Division "C."

Walker & Wolf, for plaintiff and appellant.

J. C. Henriques, for defendant and appellee.

ST. PAUL, J.—Plaintiff alleges that she entrusted her piano to defendant to be kept for her in storage; and that she demanded the return thereof which was refused. She now sues for the value of the piano and for damages for being deprived of its use etc.

The defendant filed an exception of no cause of action

which the trial Judge overruled. The exception is purely technical, it being urged that defendant should have sued for the piano itself and not for its value.

The claim for damages surely states a cause of action, but as these damages are not insisted upon here, we will consider the matter as if plaintiff were suing only for the value of the piano.

Now the owner of a thing found in the possession of another generally sues for the thing itself and, in the alternative only, for the value thereof.

The reason is that the owner is first of all, desirous for and entitled to, the return of his property, the alternative demand being intended only in case the defendant should convert the property pending the effort to recover it.

But the owner is not always bound to this course. When the property has already been wrongfully converted the plaintiff may sue at once for the value thereof and for his damages. And it is well settled that any refusal to deliver the property in demand, not founded on the existence of some right or interest therein, is a wrongful conversion thereof.

Moreover the Supreme Court has just decided (**Dupre Leblanc Jr., vs. United Irrigation & Rice Milling Co**) that:

"The tendency of modern practice is to yield as little as possible to technicalities, and where the allegations are sufficient upon which to predicate a judgment the exception of no cause of action will not be sustained on appeal."

We are of opinion that the exception was properly overruled.

On the merits we think the case is with plaintiff, notwithstanding the finding of the District Judge that plain-

tiff had not made her case certain. Upon all issues of fact the finding of the trial Judge is undoubtedly entitled to very great weight, but since the law grants an appeal on the facts as well as the law, an appellate Court is in duty bound to consider and weigh the evidence for itself and reach its own conclusion based thereon.

It may be said at the outset that in the case at bar plaintiff is seeking no equity but relies exclusively upon a clear legal right; hence the fact that her own conduct may not have been above reproach, can have no bearing whatever upon her right to recover if the facts be as she claims.

She testifies that she was indebted to defendant for some house furnishings purchased on credit, and was also indebted to her landlord for rent; that being in fear that the latter would seize her piano and the furnishings she invited defendant to take back his goods, which he did, and also arranged with him to have him store her piano at $1.00 per month; that defendant agreed to receive the piano in storage and sent his wagon and men to get the same.

Mrs. Rose Lynch, who lives at 1123 St. Charles Street, and a Mrs. G. L. Morris, corroborate her as to the piano having been taken off by defendant's wagon in charge of a man, who was identified in Court as defendant's brother, assisted by a colored man.

Mrs Lynch also corroborates plaintiff's testimony that she called and saw defendant's bookkeeper, and the latter admitted having the piano on storage, but after a conversation over the telephone with defendant, he would not accept storage on the piano unless plaintiff agreed to pay for the house furnishings goods, which defendant claimed he had not agreed to take back.

Mr. J. G. Lynch, a well known deputy clerk of the Civil District Court, testified that he called on defendant

in company with Mr. G. L. Morris, and saw defendant himself, who admittted that he had taken the piano on storage for plaintiff, but that he did not then have it in his store, though it was under his control; but that he could not let her have it because she owed him for goods bought on the installment plan, which goods he admitted having gotten back from plaintiff, but which he claimed were ''no good to him.''

Mr. Lynch's testimony is substantially corroborated by Mr. Morris who went with him.

The defense was simply a general denial. The first witness for defendant was his brother Edward Oppenheimer.

He testified that plaintiff had come to him on the street and asked him to store her piano, because she was about to be seized; that he told her that he had no place to store it but would take it to his residence if she was willing, to which she agreed and which he did; and that he has never seen plaintiff since.

To the question; ''That was the first time you ever saw her?'' he returned no answer. To the question, ''Did you take that piano from 1130 St. Charles (from which the piano was hauled) he answered that he did not haul it himself but that it was hauled by a darkey named Enos.

Afterwards he was recalled and asked if he still had the piano. He answered that he still had it ''indirectly, at an aunt of mine, not exactly stored, but it is in her residence.'' He and his aunt live ''about 17 miles apart,'' and he sent it to his aunt because his mother came to town and wanted room to put in a davenport. This in spite of the fact that he knew plaintiff had been seeking to get possession of the piano from his brother, and on top of the testimony of his brother-in-law (Hirsch) that the piano had been ''in the back yard'' over eight months.

But plaintiff, says he, can have the piano at any time she wants it, on paying storage at $2.00 per month (for nearly three years); and although he knew that she wanted it stored for only three months, and had been endeavoring to get possession of it, "he never took the trouble to look her up," even when she filed this suit.

This is the substance of Edward Oppenheimer's testimony. Of the **manner** in which he testified the following is an example:

By the Court:

"Didn't you know that she made a demand on your brother for the piano?"

"No, sir."

Next question but one:

"Didn't you know that she told your brother's representatives that the piano was up there, and offered to pay the storage, and they refused to turn it over to her until she paid the balance due on certain goods purchased on installments?"

"Yes, sir."

Thus in one breath he contradicts himself, and corroborates the witnesses for plaintiff.

The colored man, Enos, testified that he handled the piano in his own wagon: "You have your name on it? "No sir, not at that time."

And later on: "Do you own the wagon?" "No, sir." "Who did that wagon belong to?" "Ed. Clutz." "That was not Mr. Oppenheimer's wagon?" "No, sir, the same wagon I am driving now."

Defendant's colored driver testified that he did not haul the piano nor the furnishing goods. But this signifies nothing; since it is admitted that at that time defendant had two wagons, and even if there was only one driver that day, it would still have been possible for Ed. Oppenheimer, and "a couple of extra men" to have

gone for the piano with defendant's wagon, as plaintiff's witnesses testify they did.

Defendant's shipping clerk testified only that no piano was ever received **at the store.** His bookkeeper testifies that the **books** show no account for storing the piano, and allow defendant no credit for any returned goods. Otherwise the bookkeeper remembers nothing except that he heard defendant deny that he had the piano on both occasions, when he telephoned to him in presence of plaintiff, and at the time of Mr. Lynch's visit.

Defendant testified that he met plaintiff but once. Here is his account of what took place:

"Did Mrs. Draper come and want to store that piano with you?"

"She came to see me one time, and she said she was scared about getting into trouble with her landlord, and she wanted me to **ship it away,** and I told her I didn't do that kind of business."

He was not present when Mrs. Draper and Mrs. Lynch called, and says he received no telephone message about the piano at that time. (His bookkeeper testified that he had telephoned.)

Of the visit of Mr. Lynch and Mr. Morris his account is as follows:

By the Court:

"Did you tell them that you could put your hand on that piano?"

"No, sir."

Next question but one: "What was the whole conversation." "Mr Lynch stepped in the store with some other young man, and he said, 'I want to see Mr. Oppenheimer,' and he said 'Are you Joe. Oppenheimer', and I said 'Yes, sir'; and he said 'I come to tender you $3.00 storage on the lady's piano.' I looked at him and I said 'She' no,

— 8 —

he handed me the money, and I said 'Mr. Chase, make her a receipt,' and he said 'No, I want to pay $3.00 storage on the piano,' and I said 'She don't owe me no storage on the piano,' and he looked like an attorney to me; and I had three questions to answer, 'I never got that lady's piano; I never handled a piano; and I haven't got her piano now.' · Three questions I answered him in regard to the piano."

The apparent lapse in the foregoing is supplied by a previous statement, "I told them I would take the $3.00 on the account of Mrs. Draper's bill; and they said no, they wanted it to go on the piano."

. From the foregoing it is apparent that there is conflict of testimony at three points. First between Mrs. Draper, Mr. Lynch and Mr. Morris, on one side, and Ed Oppenheimer and 'Enos' on the other side, as to whose wagon removed the piano. And there can be no question that the last two are not worthy of belief, both on account of their self contradictory statements, and on account of the utter improbability of Ed Oppenheimer's actions, which were doubtless the reason of the District Judge's finding that "the conduct of all parties in interest was somewhat out of the ordinary."

Again there is a conflict between the testimony of Mrs. Draper, Mrs. Lynch, and Mr. Morris on one side, and the defendant and his bookkeeper on the other side, as to the defendant having admitted that he had the piano in his control. Eliminating entirely the testimony of plaintiff, and considering only the testimony of Mrs. Lynch, Mr. Morris, and the bookkeeper, there is still a preponderance of evidence for plaintiff both in the number of and circumstances of the witnesses.

But even disregarding this, there remains the testimony of Mr. Lynch, who, as we have already stated, is

— 9 —

a well known clerk of the Civil District Court, without interest whatsoever in this controversy.

Opposed to his testimony is that of the defendant whose business methods have already been examined into and considered by this Court (See **Succession of Dora Halley**, No. 3147 of our docket) with result that those methods do not tend to the enhancement of his credibility as a witness.

Add to this that defendant has never answered any communication from the different attorneys who have had plaintiff's interests in charge, otherwise than by a simple denial that he had the piano; and has never disclosed the pretended whereabouts of this piano until this case was actually on trial, although he knew it all along; that defendant has not attempted to seize the piano for the balance out of which he claims, (in effect) that plaintiff has beaten him, and has not even reconvened for that amount in this suit. And the conclusion is irresistable that defendant has simply been keeping the piano in hiding to coerce plaintiff to pay for the returned goods which were "no good to him."

Be all this, however, as it may, we have read the testimony carefully, and find that for plaintiff to be straithforward, clear and convincing, whilst that for defendant is self-contradictory, confusing and generally unsatisfactory. We rise from a consideration thereof fully convinced that plaintiff has made out a case, amply sufficient to justify a judgment in her favor for the value of her piano.

It is therefore ordered that the judgment appealed from be reversed and it is now ordered that there be judgment in favor of plaintiff, Mrs. J. H. Draper, and against the defendant, Joseph Oppenheimer, for the full sum of three hundred dollars with legal interest from date of

judgment until paid and all costs of both Courts.

June 26th, 1911.

Rehearing refused Oct. 23, 1911.

November 28, 1911, Decree Supreme Court, writ denied.